SELMA L. JACKSON v. CURTISS-WRIGHT AIRPLANE COMPANY, Employer, and LIBERTY MUTUAL INSURANCE COMPANY, Insurer, Appellants.—68 S. W. (2d) 715.

Division Two, February 23, 1934.

*Woodward & Evans* for appellants.

*Harry Troll* and *Clarence J. Neudeck* for respondent.

· WESTHUES, C.—We have adopted appellant's statement of the case, which reads as follows:

"This is an appeal from a final award of the Compensation Commission wherein the claimant (respondent here) was awarded $12,-000 on account of the death of her husband, who was alleged to have been in the employ of .the Curtiss-Wright Airplane Company at the time of his death.

"Dale ('Red') Jackson, a well-known aviator, was killed in Miami, Florida, on January 6, 1932, while attending the Miami air meet. At the time of his death he was flying a newly-constructed airplane known as a 'Teal Amphibian,' which had been developed by the Curtiss-Wright Airplane Company at its St. Louis factory and flown to the Miami Air Meet the day before Jackson was killed. Claimant is the widow of Jackson, having been married to him on June 2, 1929, and, so far as the record shows, totally dependent upon him for support.

"The above facts were not in dispute. The main controversy at the hearing concerned the question of Jackson's employment by the Curtiss-Wright Airplane Company, and the Employer's and Insurer's answer set out that Jackson was not in the employ of Curtiss-Wright Airplane Company at the time of his death.

"In support of the issue concerning the employment, claimant testified that on January 6, 1932, her husband was working for Curtiss-Wright Airplane Company as a demonstrator of a Teal Amphibian airplane at the rate of $10 a day, one day off a week, and that he had been in this employment since the later part of December, 1931 (approximately one week), having been employed at the Lambert-St. Louis Airport by Walter Beech, president of the company. On cross-examination it developed that the source of information upon which the above testimony was given was from statements made by deceased to the claimant, and thereupon the Employer and Insurer moved that the above testimony be stricken from the record. Upon an adverse ruling to this motion exceptions were duly saved.

"In further support of the assertion that Jackson had been employed to demonstrate the new airplanes at the Miami Air Meet, Philip Silverson, an aerial photographer at whose home claimant was living at the time of the hearing, and who stated that he was a close personal friend of Jackson during his lifetime, testified that some time in the latter part of December, 1931, he was with Jackson at the Lambert-St. Louis air field when they met Mr. Beech, president of the Curtiss-Wright Company. The new Teal Amphibian plane was standing near the Curtiss-Field factory and Jackson and Beech got into a discussion concerning the plane. Beech asked Jackson if he wanted to fly the plane at Miami. Jackson replied that he would, but wanted to know what the compensation would be. Beech told him that he would pay him $10 a day. During the discussion concerning the merits of the plane Mr. Beech asked Jackson whether he thought the ship could be outside looped and Jackson said he would try it.

"Gordon Israel, who described himself as an aeronautical research engineer, and who had formerly been in the employ of Curtiss-Wright Airplane Company as a draftsman, testified that shortly after Christmas of 1931, he was with Jackson in Louie's Restaurant at the

St. Louis Airport, when Mr. Beech came in and said to Jackson, 'Well, do you think you can outside loop it?' Jackson replied that he would try it, and then asked Mr. Beech: 'What do I get out of this?' and Beech answered: 'Ten dollars a day.' At this point Jackson turned to the witness and said: 'That will pay for my expenses at Miami and make it worth while for me to go there.'

"Considerable evidence was introduced to show Jackson's reputation as a flyer and the number of records he had made.

"The evidence also showed that Jackson flew his own plane to Miami, and that he had stored it at the Von Hoffman hanger before leaving St. Louis, paying storage charges.

"Opposed to this testimony, the Employer and Insurer introduced considerable evidence, both oral and documentary, which tended to show that Jackson was not in the employ of the company at the time of his death. Mr. Beech, who at the time of the hearing was no longer connected with the Curtiss-Wright Airplane Company, testified that he returned to St. Louis two or three days after Christmas of 1931, and assisted in preparing the Teal amphibian planes for their journey to Miami. He left for Miami on January 1st. During the interim while he was in St. Louis Jackson approached him with the request to fly one of the ships to Miami, but he was told that the company had regular pilots employed to do that kind of work and no additional men would be employed or expense created. Jackson was never employed by the Curtiss-Wright Airplane Company during the time that Mr. Beech was president of the corporation, which extended from some time in 1930 until March of 1932. The witness denied that he had ever had such conversations with Jackson as were detailed by the witnesses Silverson and Israel.

"K. K. Shaul testified that during December, 1931, and January, 1932, he was vice-president and treasurer of the Curtiss-Wright Airplane Company at Robertson, Missouri (Lambert-St. Louis Airport). At the time of the hearing he was no longer connected with the company. He testified that shortly before the Teal amphibian planes were taken to Miami Jackson approached him concerning a proposed flight by Jackson to Florida in one of the planes, but he did not employ Jackson. Jackson was not employed in any capacity by the Curtiss-Wright Company during this period.

"Ray Washburn testified that in January, 1932, he was manager of the Curtiss-Wright flying service at Miami. He did not any time employ Jackson on behalf of the Curtiss-Wright Company.

"In addition to this testimony there was evidence tending to show that the particular plane involved was designed as a very light sport model with a weight of less than 2,000 pounds and of wood construction. It was not designed for stunt flying and such stunts as outside-looping were not even considered. The plane had been test-flown shortly before leaving for Miami and it was taken there for the pur-

pose of introducing it to the general public. On the morning Jackson was killed it was drawn up in front of the hangar and there is a custom at such air meets whereby any licensed transport pilot of good reputation could fly the plane by simply obtaining permission of some company official. A number of different pilots had flown the ship on the morning of January 6th when Jackson requested permission to do likewise. He was granted this permission by Mr. Beech, who cautioned him concerning stunt flying. Jackson went up in the plane, put it through several maneuvers, when suddently he turned it over and commenced an inverted dive, when the wings collapsed and Jackson was killed. The Curtiss-Wright Company had a number of capable demonstrators at Miami, including Casey Jones, Harry Copeland, Carl Volter and O. G. Horner. The latter two flew the ships from St. Louis to Miami.

"Mr. Beech admitted that he had defrayed the expenses of Jackson's funeral, which amounted to $2,500, and that he drew on the company for this expense. He said that he was advised that the undertaker at Miami would do nothing to the body until he was assured of payment, and this was the reason for Mr. Beech's assumption of the expense. He stated that it was done out of courtesy for a noted aviator and that he had on previous occasions done the same thing for other men.

"The employment records of the Curtiss-Wright Company were introduced in evidence and the course of business in connection with employment was explained. The name of every employee, regardless of his class, appeared of record. Dale Jackson had been employed by the company prior to February 27, 1929, at which time he was removed from the payroll with the notation that he had obtained a better job. After that time his name did not appear on any of the various payrolls of the company. It further appears in evidence that during December, 1931, Jackson was employed by the National Refining Company on some gasoline tests and that just before leaving for the Miami air meet he filled out an application for employment as a mail pilot with the American Airways and that this application was delivered to the American Airways by Silverson shortly after Jackson's departure.

"Upon the submission of this evidence the Referee of the Compensation Commission, who heard the case, made an award which contains a statement of facts. This statement reviews the testimony and gives to the testimony of Claimant on the issue of employment its probative value, on the ground that the Employer's and Insurer's objection to the incompetent testimony was not timely. The award contains a finding that Jackson was employed by the Curtiss-Wright Airplane Company and compensation was awarded at the rate of $20 per week for 600 weeks.

"An application for review was filed, after which the full Com-

mission made its final award affirming on review the award of the Referee.

"Due notice of appeal was given and the cause was transferred to the Circuit Court of St. Louis County, where after a judgment affirming the final award of the Commission, Employer and Insurer prosecuted this appeal."

To the statement of appellant it may be added claimant testified that after her husband had been killed she had a conversation with a Mr. Copeland, an employee of the company, with reference to the funeral expenses. Her testimony is as follows:

"A. Well, I talked to Mr. Copeland, down in Miami, Florida. He came up to my room at the hotel.

"Mr. Troll (continuing) (Q.): What hotel? A. We were staying at the Miami-Colonial; and he asked me whether arrangements had been made for the funeral. I told him I couldn't afford a very large funeral, because Mr. Jackson hadn't left very much, and he said as long as he was an employee of the Curtiss-Wright Company— told me not to worry about anything at all; everything would be taken care of."

Other facts will be stated in the course of the opinion.

Appellant presents two main questions for reversal of the award. First, it is alleged that the testimony of claimant with reference to the employment of deceased should have been stricken from the record by the referee because it was hearsay; that the award was largely based on that testimony, which was not sufficient to support the award. Second, it is alleged that there was not sufficient testimony to support the method used by the commission in computing the amount of compensation awarded, particularly that no showing was made that the defendant company operated its line of business, in which deceased is alleged to have been employed, throughout the whole year.

■ Appellants are correct as to the first contention that a part of the testimony of claimant should have been stricken from the record as purely hearsay. We carefully read the evidence of claimant and found nothing in the direct examination which disclosed that the source of claimant's information, as to the employment of her husband, was obtained by hearsay. This was first disclosed on cross-examination and then counsel for defendants immediately moved to strike out the testimony. This was the first opportunity counsel had, after discovering that the evidence was hearsay, to make objection thereto. If a party to a lawsuit desires to object to hearsay evidence the objection must be promptly made or he will be deemed to have waived the objection. If, however, there is nothing in the questions asked or the answers given that would indicate or disclose that the evidence was hearsay then a motion promptly made on discovery to have the hearsay stricken from the record should be sus-

tained. We so ruled in State v. Cain, 37 S. W. (2d) 416. See cases there cited.

■ Appellants are in error, however, that the hearsay evidence was the main support of the award. Two witnesses testified of hearing the president of the company employ the deceased. The widow testified that an employee of the company informed her that since deceased was an employee she need not worry about the funeral arrangements or expenses. That was not all. The circumstances of the case coincided with that testimony. The company did arrange and pay for an elaborate funeral. The deceased did go to Miami and was killed in the very plane that the president of the company was alleged to have requested deceased to demonstrate. Silverson also testified without objection that after a consultation between deceased and Mr. Walter Beech, president of the company, deceased made the statement to the witness: ''Well I've got a job.''

Appellants urge that the evidence of the two witnesses, Silverson and Israel, is unbelievable. They were not impeached at the trial. It is said that the record disclosed they were close friends of the deceased and claimant. Grant that to be true, that alone does not justify disregarding their evidence. We are not here to pass upon the weight of the evidence. That was a question for the triers of the facts, in this case the members of the Compensation Commission. [Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601.] There being substantial evidence in the record to support the finding that deceased was employed by the appellant, Curtiss-Wright Company, that finding is binding on us. The proceedings before the Compensation Commission are prescribed by statute, Section 3349, Revised Statutes 1929 (Mo. St. Ann., p. 8283), to be informal and without regard to the technical rules of evidence. ■ While incompetent evidence will not support an award, Woods v. American Coal & Ice Co., 25 S. W. (2d) 1. c. 146(4), its admission does not justify setting aside an award in a case where there is substantial, competent evidence to support it. Therefore, the hearsay evidence admitted by the referee upon the question of employment does not justify reversal. Evidence of like character was admitted without objection. It was cumulative and when considered with direct evidence was of little importance.

■ The contention that the evidence did not support the amount of the award is also without merit. Two witnesses, Silverson and Israel, testified that at the time the president of the company employed deceased it was agreed that the compensation was to be $10 per day. Other evidence disclosed that as a rule a pilot was given one day off each week making the salary $60 per week. This evidence was sufficient to support the award on the question of the amount of earnings.

■ Appellant contends there was no evidence introduced showing the company operated, during the whole year, the particular business

in which deceased was employed (if employed, which was denied) and, therefore, the Compensation Commission erred in awarding compensation under provisions of Section 3320, Revised Statutes 1929, subdivision (d), and using three hundred days as a basis for computing the annual earnings. [Biswell v. St. Louis-San Francisco Ry. Co., 49 S. W. (2d) 203, is cited as authority.] We think the St. Louis Court of Appeals in that case correctly interpreted the meaning of Section 3320 and its various subdivisions on the point involved. We quote with approval the following from the opinion:

"Considering all of these sections together, the conclusion seems to be inevitable that, if the employee was employed in a grade which was operated by his employer continuously throughout the working days of the year, then the computation to be made would have to be based upon the provisions of Section 3320 (d), but since, under the provisions of subdivision (b), the employment shall be taken to mean in the grade in which the employee was employed, the calculation likewise must be based upon the operation in the grade in which such employee is employed. If the railway company, because of its operation of the railway every day in the year, is to be held to operate each one of its departments for the entire year, many of the seasonal occupations connected with their operation would lead to the necessity of applying subdivision (d) to every accident that might occur in any branch of its departments, irrespective of the occasional operation of such departments only. We are unable to concur in such a construction. If that construction was adopted, it would mean that every concern, although operating its general business during the whole year, would be subject to the provisions of subdivision (d), although it might be engaged for short periods in some specific enterprise which is an incident only of its general business."

Section 3320 and the subdivisions thereof were fully considered and discussed in Hartman v. Union Electric Light & Power Co., 331 Mo. 230, 53 S. W. (2d) l. c. 243, 245 (3, 4, 5). In the case before us there was no direct evidence introduced for the purpose of showing that the company operated during the whole year. Neither was there any evidence that it did not so operate. However, appellant, Curtiss-Wright Company, introduced in evidence its records showing deceased had previously been employed by the company as a test pilot at $50 per week from September 20, 1928, to February 27, 1929. The record recited in part as follows: "Removal of Dale Jackson, employed as test pilot to and including 5:00 p. m., February 27, 1929; reason for quitting—had a better job." The evidence further disclosed that deceased was employed by the Curtiss-Wright Company as a test pilot and demonstrator during the summer of 1930, at which time he made an endurance flight for the company that exceeded all previous records. Gordon Israel testified on this subject as follows:

"Q. How long did he work for them? Do you know? A. Well,

I don't know exactly. He worked there until the first endurance flight and I believe that was in the middle of the summer of 1930.

"Q. Do you know when he left then after this endurance flight? A. Well, right after that endurance flight they went on a tour and he came back—

"Q. Tour for whom? A. Well, a tour—they practiced refueling flights for county fairs.

"Q. For whom was he working? A. The Curtiss-Wright Airplane Company.

"Q. Now, then, when he went on the second endurance contest flight, did he leave the company or did he get a furlough? Do you know?

"MR. EVANS: I'm assuming now he's speaking from his own knowledge, not from what he heard from somebody else. A. I don't know just what his connections were with the company at that time—whether he got a furlough. I do know that the second endurance flight was his own project—he and Forrest O'Brine."

Mr. Beech, president of the company at the time, testified as follows:

"MR. EVANS (continuing) (Q): Just testify, Mr. Beech, as to any conversation you had with Mr. Jackson concerning that flight to Florida. A. Mr. Jackson came down at least twice, to my knowledge, and asked permission to fly the ships down there, one of the ships. I took the matter up with Mr. Shaul, my general manager.

"Q. Who was Mr. Shaul? A. He was the general manager of Curtiss-Wright. Mr. Jackson was told *we had our regular pilots employed to do that kind of work* and we would not take on any additional men or expense." (Italics ours.)

Mr. Beech, in explaining the process of manufacturing airplanes gave the following evidence:

". . . The actual fabrication of the thing is done in the factory. After the blue prints are all made, after the machine is far enough along to test certain parts, they're tested to determine their strength, whether or not they're strong enough to fly. After the machine is finally finished it is weighed and test-flown. If the test flight indicates that it is satisfactory we go through what we call a Department of Commerce test; in other words, we try to determine whether or not it would meet their requirements. If we determine that it will, or think it will, we feel then we are ready to continue with the development by the actual flying of the ship—give it a service test, and final information is completed. This information is sent to Washington. After that is approved or checked over, if it is approved they send their own inspectors in, flight inspector. He makes static tests on the machine and flight tests. If they all check the machine is given an A. T. C.; usually requires about a year to develop an airplane. Is that thorough enough?"

Viewing the evidence as a whole and piecing together excerpts of the testimony of a number of witnesses there is sufficient evidence in the record to prove that appellant's plant was operated during the whole year. The evidence clearly shows that test pilots were also engaged in demonstrating the various models of planes at public exhibitions for advertising purposes. That test pilots were regularly employed during the whole year is clearly shown by the testimony of Mr. Beech. The testing of planes by test pilots was necessary and imperative prior to placing them on the market for sale. It was work interwoven with the process of manufacture and formed a part thereof. Appellant, therefore, if employed at all, was employed to do work which formed a part of the business of the company in which it was regularly engaged and which operated throughout the working days of the year. By the company's own records it was shown that deceased had been previously engaged in the same line of work during the winter when there would naturally be a lull in public exhibitions throughout the greater part of the United States due to seasonable weather conditions. The Compensation Commission was, therefore, justified in computing the amount of compensation under subdivision (d) of Section 3320. What was said in Hartman v. Union Electric, 331 Mo. 230, 53 S. W. (2d) l. c. 245 (4, 5), may well be applied to this case.

Counsel for appellants insists that this court ought not to permit an award to stand "where it appears from the award itself that the same is based upon incompetent and prejudicial testimony and where the only other evidence in support of the award is of such character as to arouse grave suspicion as to its credibility, if not a direct conclusion that it constitutes perjury, particularly where the great weight of the entire evidence is opposed to the finding of the commission." Due to this contention of counsel we have carefully considered the evidence with that contention in mind and have concluded that we are bound by the finding of the commission upon the questions of fact. We cannot say as a matter of law that the evidence of respondent's witnesses constituted perjury. It is not inconsistent with any physical facts nor so beyond reason as to be unbelievable.

We are, therefore, in duty bound to affirm the judgment. It is so ordered. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.