Georgiann HAWKINS, Claimant-Respondent,

v.

NIXDORFF-KREIN MANUFACTURING COMPANY, Employer, and Liberty Mutual Insurance Company, Insurer, Appellants.

No. 31883.

St. Louis Court of Appeals.

Missouri.

Sept. 21, 1965.

Edward Friedewald, St. Louis, for appellants.

Edward F. Downey, Lawrence E. Ehrhart, John J. Delabar, St. Louis, for claimant-respondent.

DOERNER, Commissioner.

This case, involving a claim under the Workmen's Compensation Act, was recently reassigned to the writer. The Industrial Commission by its final award modified but affirmed the Referee's award in favor of claimant. The employer and insurer appealed to the Circuit Court of the City of St. Louis, which entered a judgment affirming in part and reversing in part the Commission's final award. Both sides appealed from the judgment, but as the claimant subsequently dismissed her appeal we have before us only that of the employer and insurer.

On January 5, 1959 Georgiann Hawkins, the claimant, was exposed to carbon mon-

oxide gas when it filtered into a room in which she was working for Nixdorff-Krein Manufacturing Company, her employer. When her foreman directed her and her fellow employees to leave the room she went first to the ladies' room. She felt weak, dizzy, nauseated, and had a headache, but did not regurgitate. Oxygen was administered to her. Later she went to the nurse's office, became shaky and started to cry, and laid down on a cot. While there she received more oxygen. Thereafter she was taken to St. John's Hospital in an ambulance, but her recollection of the trip and of arriving at the hospital was hazy, and her mind is, "kind of blank" as to that period. She remained in the hospital for five days, and continued to experience headaches, weakness, dizziness and nausea. At the time she was discharged she was still suffering from the same complaints, although they had improved. The discharge summary in the hospital records as dictated by Dr. J. J. Hammond was "Carbon monoxide intoxication."

Claimant returned to work at Nixdorff-Krein on the following Monday. She testified that shortly thereafter she felt weak and nauseated, and started to have crying spells for no apparent reason. She would become "real shaky," start to cry, and be unable to stop. Prior to her exposure to carbon monoxide gas she had never felt weak, dizzy, nauseated, shaky, nor had she experienced such crying spells. About four or six weeks later her employer laid her off, telling her it was for lack of work. According to claimant, she was unemployed for two or three weeks, then worked at Carter Carburetor for five months during the following year, interspersed with lay-offs. Thereafter she began to work as a waitress, at several restaurants successively, but was forced to discontinue her employment at two of them because she became too nervous to work. She was treated by Dr. L. Reuter and Dr. Hammond while in the hospital and continued to see Dr. Reuter for the following six weeks until, becoming dissatisfied with her failure to progress,

she changed to Dr. A. J. Reuter, her own doctor. She testified that her headaches and dizziness became worse, she would feel faint and have to lie down, and that she became so nervous that she couldn't control such attacks. According to claimant, in March 1961, at Dr. Steiner's office, she received a shot for her tense and nervous condition, and as she started to leave she fainted. Thereafter and until the hearing, in September 1962, she fainted nine or ten times. She testified that at the time of the hearing she was still experiencing headaches, weakness, dizziness, nausea, and the pain in her chest; that noise depressed her; and that when she becomes depressed she starts to cry and cries constantly. She also related that while she was in the hospital she heard noises, but that that condition had improved and didn't bother her as much as it had; but that when she walks she sometimes stumbles; and that since the exposure she had lost her balance quite a few times and has caught herself as she started to fall.

Claimant's husband, Clarence D. Hawkins, testified that since claimant was hospitalized she has constantly complained of headaches and "* * * acted like she was dopey"; that she "has been crabby with the kids and me too"; and that on three occasions he has seen her come out of fainting spells, and that she "Looked wild."

Dr. A. J. Steiner, who appeared on behalf of claimant, testified that he first saw her on January 20, 1959. She complained of headaches, dizziness, crying spells, and shortness of breath. He prescribed sedatives. Her complaints continued for over a year, and he increased the medication for her nerves. On January 23, 1961, in his office, claimant had "* * * a slight generalized convulsion, a petit mal epileptic seizure. She convulsed and gave me a busy time for a while." Asked to describe her appearance he stated: "Her head looked like her eyes were rolled back—she lost consciousness; she jerked her extremities,

her tongue protruded from her mouth; her jaw shook also; she did not foam at the mouth and eventually she regained consciousness and was given sedation and I advised her at that time to have an electroencephalogram made." Dr. Steiner described petit mal epilepsy as a disease that shows itself with complaints of dizziness, headaches, sometimes nausea, loss of breath, and sometimes loss of consciousness of short duration. He distinguished it from the grand seizures, the other type of epilepsy, which are usually hereditary or some serious type of change. Petit mal, he related, is recorded in the medical books as being due to focal areas or small pin point areas of change from normal in the brain tissue. Asked whether carbon monoxide poisoning could cause petit mal epilepsy he replied that it could, and explained that carbon monoxide produces little areas of hemorrhages in the brain, which leave pinhead scar areas. Dr. Steiner said claimant had been complaining of headaches, weakness and dizziness prior to her seizure but her description of what happened to her had not been clear; and that after the convulsion in his office he pieced together that she had had similar seizures without actual convulsions, but that she did not realize what had occurred.

Following the incident in his office Dr. Steiner changed the medication and continued to treat claimant. He testified that she did not complain of having as frequent attacks, and that she was not as nervous or dizzy. In answer to a long hypothetical question which called for his diagnosis, the doctor stated that in his opinion claimant has a type of petit mal epilepsy with a good deal of nervous tension, which tension may be due to some psychological neuroses; that her condition was disabling; and that, assuming the matters incorporated in the hypothetical question, the disabling condition was causally related to the carbon monoxide inhalation which occurred on January 5, 1959.

Dr. D. Frey Mendelson, a neurologist, who was called to the stand by claimant, testified that he examined her on October 5, 1961. She complained of recurrent headaches, fainting spells, irritability, nervousness, and depressed periods following being overcome by carbon monoxide, and related that since leaving the hospital she had experienced three fainting spells. He made an electroencephalogram, which he interpreted as showing a mild mixed fast and slow dysrhythmia or alteration in normal rhythms. He described an electroencephalogram as a recording of the electrical activity of the brain, and stated that it was a diagnostic aid to doctors used in conjunction with the patient's history and the findings or physical examination. Dr. Mendelson stated that " * * * Taken together with her history of loss of consciousness, in my opinion the record was consistent with the diagnosis of a convulsive basis for complaints, but not entirely diagnostic." The doctor also said that, "Based on the history and examination, it seemed to me likely that Mrs. Hawkins did have a mild seizure disorder. * * * " The seizure disorder was disabling, he related, contingent upon the frequency and severity of the seizures and the amount of control produced by medication. A lengthy, hypothetical question was propounded to him concluding with the inquiry whether he could state with reasonable medical certainty that the claimant's seizures were the result of the carbon monoxide intoxication on January 5, 1959. Repeating the essential facts hypothesized, the doctor replied that, "Presuming these are convulsions and presuming she was intoxicated and presuming she had no previous convulsions prior to that intoxication, in my opinion, with a probable degree of reasonable medical certainty, the seizures are related to the intoxication." He explained that carbon monoxide has an infinity of some 206 times that of oxygen or the hemoglobin molecule; that even a small concentration of carbon monoxide in the air can rapidly bind the hemoglobin in the

red blood cells and prevent them from carrying oxygen to the tissues; and that the deprivation of oxygen causes the injury to the central nervous system. Asked whether the deprivation of oxygen from the cells of the central nervous system could result in convulsive disorders he answered in the affirmative. The doctor further testified that nervous or convulsive disorders do not always show up on an electroencephalogram, and that the electroencephalogram is a relatively "crude instrument," merely another diagnostic tool which doctors use although such tools are not uniformly diagnostic.

The referee found that claimant sustained an accidental injury arising out of and in the course of her employment which resulted in damage to her central nervous system and in a convulsive disorder, and further found that her permanent partial disability was twenty-five per cent of her body as a whole. The Industrial Commission likewise found that claimant had sustained injury to her central nervous system and that she was suffering from a convulsive disorder in the form of petit mal epilepsy, but determined her permanent partial disability of the body as a whole to be twelve and one-half per cent. That finding and determination was approved and affirmed by the circuit court, but it reversed other features of the final award with which we are not concerned.

■ ■ We have reviewed the claimant's medical evidence at some length because all of the points raised by the appellants relate to that part of the case. The first of these is that Dr. Steiner's opinion that claimant suffers from petit mal epilepsy caused by the carbon monoxide ·ntoxication was based on hearsay and incompetent evidence, and is therefore insufficient to sustain the award. As a basis for their contention the appellants point out that on cross-examination Dr. Steiner, after reiterating his opinion that there had been tissue change in the claimant's brain, stated that he based his opinion both on his own observations and on an electroencephalogram report other than the one from Dr. Mendelson. He was not asked who made the report nor is it otherwise definitely identified in the record. Appellants urge that the report was hearsay, and that since the doctor's opinion was based on hearsay it was incompetent. The weakness in appellants' position, however, is that upon becoming apprised that Dr. Steiner's opinion was in part founded on the report not in evidence they did nothing towards removing it from the record. Assuming for the benefit of appellants that they were not aware that the doctor's opinion was based in part on hearsay until cross-examination disclosed it, appellants on such disclosure had ample opportunity then to move to have such testimony stricken from the record. They failed to do so and thereby waived their objection to the doctor's opinion, Jackson v. Curtiss-Wright Airplane Co., 334 Mo. 805, 68 S.W.2d 715; Gerald v. Caterers, Inc., Mo.App., 382 S.W. 2d 740. Furthermore, as was stated in one of the cases cited by appellant, Miller v. Ralston Purina Co., 341 Mo. 811, 109 S.W. 2d 866, 869: " * * * And hearsay, if not objected to, will be considered in reaching a conclusion. * * * " To the same effect see State ex rel. State Highway Commission v. Williams, Mo., 289 S.W.2d 64; Williams v. Cavender, Mo., 378 S.W.2d 537; Hill v. Seaboard Fire & Marine Ins. Co., Mo.App., 374 S.W.2d 606.

Appellants next contend that clinical or laboratory tests are necessary to differentiate between a petit mal epileptic convulsion and a fainting spell, and that Dr. Steiner's conclusion that claimant had such a convulsion in his office is based upon surmise, speculation and conjecture. There is no evidence in the record that a petit mal epileptic convulsion can be distinguished from a fainting spell only by means of clinical or laboratory tests. The most that appears is Dr. Mendelson's testimony that a convulsive disorder may sometimes resemble a fainting spell and that at times they are indistinguishable. But at least some of the objective symptoms which the doctor

stated would distinguish a convulsion from a fainting spell were previously related by Dr. Steiner as being present when claimant experienced the attack in his office.

 Appellants' final point is that the finding of the Industrial Commission that claimant suffers from petit mal epileptic convulsions was based solely upon the evidence of Dr. Steiner; that Dr. Steiner's opinion in turn was based upon an unidentified electroencephalogram report; that it was contrary to all of the other such reports introduced in evidence; and that the Commission's finding was contrary to the overwhelming weight of the evidence. In the first place, Dr. Steiner's opinion that claimant was suffering from petit mal epilepsy caused by carbon monoxide poisoning was not the only evidence as to claimant's disability and its causation. Dr. Mendelson also testified to the same effect. And secondly, there was no evidence that an electroencephalogram would in all instances conclusively reveal whether or not the patient examined was suffering from petit mal epilepsy, or that the results it showed were invariably accurate. In fact, the only evidence in the record as to its reliability was that of Dr. Mendelson, the neurologist who used it, who described it as a "* * * relative(ly) crude instrument, it's merely another diagnostic tool and there are many tests which people in medicine utilize which are not uniformly diagnostic." In the light of the testimony of Dr. Steiner and Dr. Mendelson we cannot say, as a matter of law, that the Commission's finding that claimant suffered from petit mal epilepsy caused by carbon monoxide poisoning was contrary to the overwhelming weight of the evidence, even though appellants' medical evidence conflicted with that of claimants. Where the right to compensation depends upon the acceptance of one of two conflicting medical opinions or theories, as was the case here, the question to be determined is one of fact to be weighed and resolved by the Industrial Commission. Vollmar v. Board of Jewish Education, Mo., 287 S.W.

2d 868; Greer v. Missouri State Highway Department, Mo.App., 362 S.W.2d 773.

The judgment should be affirmed, and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment is affirmed.

RUDDY, P. J., ANDERSON, J., and FRANK D. CONNETT, Jr., Special Judge, concur.