Lowell JACKSON, Plaintiff–Appellant,

v.

H.D. LEE COMPANY, INC., and Aetna Casualty and Surety Company, Defendants–Respondents.

No. 15742.

Missouri Court of Appeals, Southern District, Division Two.

April 26, 1989.

Motion for Rehearing or Transfer Denied May 18, 1989.

Application to Transfer Denied Aug.1, 1989.

Glenn R. Gulick, Jr., Hershewe & Gullick, Joplin, for plaintiff-appellant.

Kelly Pool, Hendren and Andrae, Jefferson City, for defendants-respondents.

HOGAN, Judge.

This is a Workers' Compensation case. Although the claimant has presented several issues, the dispositive question tendered is whether there is substantial medical evidence that the claimant's condition is not the product of job-related stress and anxiety. The answer is "yes," and we must affirm the award of the Labor and Industrial Relations Commission denying compensation.

Lowell Jackson, the claimant, had some sort of seizure or attack resembling a stroke while he was working for the H.D. Lee Company as an industrial sewing machine mechanic. The Administrative Law Judge decided that the claim should be characterized as a claim under the Occupational Disease section of the Workers' Compensation Act [§ 287.067.1, RSMo 1986][1] rather than a claim that the claimant had sustained a compensable "accident" as defined by § 287.020.2. The ALJ concluded that the claimant had not contracted any occupational disease, and also concluded that the opinions of two physicians demonstrated that the claimant's condition was not in any event causally connected to his employment. The ALJ denied compensation. The claimant applied for review of the decision of the ALJ as provided by § 287.480 and 8 CSR 20–3.030. In its final award denying compensation, the Labor and Industrial Relations Commission [hereinafter the Commission] found that inasmuch as the ALJ's award included the finding that the claimant's present condition was not causally connected to his employment and such a finding, in which the Commission concurred, necessarily disposed of the claim, it was unnecessary to decide whether the ALJ had proceeded under the proper theory. We review the award of the Commission, and unless it is not supported by substantial evidence or is clearly contrary to the overwhelming weight of the evidence, we do not disturb it. *Ham v. Sikeston Concrete Products*, 735 S.W.2d 427, 428 (Mo.App.1987); *Barr v. Vickers, Inc.*, 648 S.W.2d 577, 579 (Mo.App.1983); *Malcom v. La–Z–Boy Midwest Chair Co.*, 618 S.W.2d 725, 726 (Mo.App.1981).

The following facts are relevant to the points tendered. Lowell Jackson was born April 11, 1936, and so was 49 years of age at the time of the ALJ's first hearing on this matter on November 27, 1985. For most of his working life, the claimant had been a sewing machine mechanic. At one time he worked for Miller Manufacturing Company; beginning in February 1981 he was employed by the H.D. Lee Company. The claimant's testimony concerning the complexity of his work was somewhat contradictory. At one point claimant testified that the machines he worked with "was just common machines, more or less; and like they have breakage or skipping or all

---

**1.** References to statutes and rules are to RSMo 1986 and V.A.M.R. except where otherwise specifically noted.

sorts of different things." At the same time, claimant's exhibit N demonstrates that the sewing machines the claimant maintained were complex industrial sewing machines, apparently manufactured by Pfaff in Germany. Lee acquired the Pfaff machines after the claimant started working as a mechanic, but he was not sent to a training school. The "day mechanic" assisted the claimant for several days, but thereafter the claimant was "started ... on a shift."

The claimant testified and had documentary evidence which indicated that he worked extremely long hours. He found the conditions of his employment stressful. He "had problems" with the manager who worked the day shift. He believed he received a disproportionate share of the "blame" when the machines were "down." The operators of the machines were piece-work operators who became upset when their machines were not operative. Sometimes the employer did not furnish enough parts for the claimant to fix the machines; on other occasions, the claimant could not obtain access to the parts the company had on hand. The claimant described his feeling of anxiety about his employment thus:

"Well, when I come in [to work] in the evening ... when I shut that big door behind me, I just felt like I was locking myself in, and I knew that—I looked over at those machines, and I knew that someone was going to start on me, and they would. They would—they wouldn't exactly just jump on me. I never had no one just jump on me, but they would pick, you know, and make sure that I understood that all the fault of any production thing was mine, you know, or made me feel that way."

On April 21, 1982, the claimant reported for work. He felt "pretty good." A machine needed repairs, and as the claimant put it, "... I seen that I was going to have to have some stuff to fix it with, or I was going to have to take off a bunch of stuff and try to raise it and heat it and straighten it up; and I just thought, oh darn...." The claimant went to the office of one of his superiors to talk about parts for the repair of the machine. The claimant told his supervisor, Prine, that he had "slight" diarrhea and was told to "take a tampax and stick it up [his] ass" and get back to work. The claimant was humiliated and angered.

Shortly thereafter, the claimant lost his memory. It is apparent and not disputed that on April 21, 1982, the claimant sustained some sort of seizure which caused him to lose his memory. The claimant was hospitalized and treated at a hospital in Lebanon. Dr. Gary M. Courter, claimant's physician, testified that the claimant suffered a cerebrovascular accident (CVA), or as the condition is commonly described, a stroke. Dr. Courter testified that the claimant was totally and permanently disabled. Such is the general background of the appeal. Other facts, as germane, will be noted in the course of the opinion.

The claimant has briefed and argued four assignments of error in this court. Points I and II tender the same issue. As stated, Points I and II are:

*"Point I*

The award of the Labor and Industrial Relations Commission was not supported by the favor found by the Commission, and there was insufficient competent evidence in the record to warrant the making of the award in favor of the employer, because the Commission found a lack of causal connection between the condition at claimant's employment and claimant's stroke without the Commission having first determined whether claimant's disability resulted from an accident or an occupational disease, in that the definition of causation under Chapter 287, *Mo. Rev.Stat.*, is dependent upon whether claimant suffered an accident or an occupational disease and the evidence established the requisite causal connection if the stroke is an accident instead of an occupational disease.

*Point II*

The award made by the Labor and Industrial Relations Commission was not supported by the facts found by the

Commission, and there was insufficient competent evidence in the record to warrant the making of the award, because the Commission erred in failing to find that claimant had suffered an injury by accident because claimant's stroke, sustained by accident, was sufficiently job related to be compensable in that the stress caused by the conditions of employment, including the lengthy hours, the change of shift, the frustration from not being properly trained on the machines he was to repair, the pressures placed on him to keep the machines in good working order under adverse working conditions, and the command by his supervisor to 'take a tampax and stick it up your ass,' was a contributing cause of the elevated blood pressure which resulted in claimant's stroke."

In the "argument" part of Point I, the claimant contends that the ALJ erred in considering the claimant's injury as an occupational disease, as defined by § 287.067.1, rather than an accident as defined by § 287.020.2. The ALJ found, among other things, that the "evidence fails to establish an accident occurred on the date of April 21, 1982, within the meaning of the Workers' Compensation definition of accident" and further found that the claimant's present condition was not causally connected to his employment as required by § 287.067.1.

Thereafter, as we have noted, the claimant sought review of the ALJ's award. In its final award denying compensation, the Commission applied the "job related" standard set out in *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983), and concluded it was of no consequence whether the claimant's condition or injury was regarded as an occupational disease or accident. The Commission found, among other things, that:

"The award of the administrative law judge includes the finding that Mr. Jack-

son's 'present condition was not causally connected to his employment.' That finding, if supported by competent and substantial evidence, mandates a denial of compensation under either the accident or the occupational disease theory. Because we concur in this finding, it is unnecessary to decide for purposes of this award whether the administrative law judge proceeded on the proper theory."

■ In disposing of the contention that the claimant's injury must be considered as an "accident" rather than an "occupational disease" it is sufficient to say that we review the Commission's decision, not that of the administrative law judge, *Richardson v. Falcon Products, Inc.,* 739 S.W.2d 596, 597 (Mo.App.1987); *Swillum v. Empire Gas Transport, Inc.,* 698 S.W.2d 921, 923[1] (Mo.App.1985), and therefore we disregard any assignments of error concerning the findings of the administrative law judge. *Swillum v. Empire Gas Transport, Inc.,* 698 S.W.2d at 923. The Commission followed the law the claimant would have this court apply, and whether the claimant's injury was an "accident" or an "occupational disease" is not an issue on this appeal.

■ Another argument we must reject out of hand is the claimant's suggestion that we take judicial notice of the causes of cerebrovascular accidents and thereby supplement the record proof of causal connection between the claimant's condition and his employment. This court cannot declare the etiology and development of a disease to be a matter of common knowledge;[2] to do so would be to create our own body of expertise and to use that expertise to determine the merits of the case. The fundamental question raised by Points I and II is whether there is substantial medical evidence to support a finding that the claimant's stroke is not a compensable injury. Medical proof of causation is essential in a

**2.** *Poignee v. John Hancock Mut. Life Ins. Co.,* 147 S.W.2d 677, 682[5] (Mo.App.1941), cert. quashed, *State ex rel. John Hancock Mut. Life Ins. Co. v. Hughes,* 348 Mo. 829, 155 S.W.2d 250 (1941) (courts cannot take judicial notice of the development and treatment of diabetes); *Rine-*

*hart v. F.M. Stamper Co.,* 227 Mo.App. 653, 656, 55 S.W.2d 729, 731 (1932) (court could not declare as a matter of common knowledge that pneumonia is not an occupational disease within the meaning of the Workers' Compensation Act).

case of this kind, *New Hampshire Supply Co., Inc. v. Steinberg,* 119 N.H. 223, 400 A.2d 1163, 1168–69[6] (1979), even though the medical proof need not have the quality of absolute certainty and may be buttressed by lay testimony. *Johnson v. City of Duenweg Fire Dept.,* 735 S.W.2d 364, 366–68 (Mo. banc 1987).

■ The claimant has undertaken to develop the significance of the decision in *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, wherein our Supreme Court undertook to expand the scope of the term "accident" as that noun appears in the Workers' Compensation statute, § 287.020.2. A more convenient and accurate approach to the basic question on this appeal would be to say that our courts have recognized that a mental, nervous or emotional stimulus may precipitate a compensable injury. *Johnson v. City of Duenweg Fire Dept.,* 735 S.W.2d 364 (stress of fighting fire caused a heart attack); *Snuggs v. Steel Haulers, Inc.,* 501 S.W.2d 481 (Mo. banc 1973) (employee subjected to unusual, abnormal and continuous physical and mental strain over a period of 27 hours in the course of his employment in order to meet a deadline; fall and resulting skull fracture sustained as a result of mental stress had to be compensable injury).[3] Admittedly there was medical evidence from which the Commission could have concluded the claimant's injury was job related; the question is whether the evidence to the contrary, which the Commission accepted, is admissible and substantial.

Two physicians who attended the claimant at one time or another testified unequivocally to a causal link between the claimant's employment and his disability. Dr. Irvin E. Kilbane, an osteopathic physician who practices in Joplin, Missouri, first saw the claimant in September 1982. The claimant had a speech defect, some difficul-

ty swallowing, eye disturbances and paralysis of his right extremity, especially his upper right extremity. Dr. Kilbane observed some muscle atrophy, weakness, inability to walk and depression. Dr. Kilbane hospitalized the claimant about January 24, 1983, upon a diagnosis of post-stroke syndrome with partial paralysis of the right extremity and intercostal neuralgia, and a secondary diagnosis of abnormal reaction to a medicine called Corgard, anxiety-depressive reaction and gastritis. Thereafter Dr. Kilbane was the claimant's regular physician up to March 1984. His testimony, which we need not repeat at length here, was that "[within] a reasonable degree of probability" the job stress imposed on the claimant by his employment was a substantial factor in causing the claimant's cerebrovascular accident.

The claimant also had the evidence of Dr. Gary M. Courter, an osteopathic physician who practices at Lebanon. Dr. Courter first saw the claimant at his office on May 12, 1981. At that time, the claimant complained of indigestion, stomach discomfort and hypertension. Dr. Courter prescribed medicine to control the claimant's hypertension and decided to monitor the claimant's blood pressure. The claimant again presented himself on April 21, 1982, complaining of headaches, loss of speech and what this physician described as incoordination. Dr. Courter admitted the claimant to a Lebanon hospital, having diagnosed his condition as a cerebral vascular accident. This physician gave as his opinion that the claimant's stroke "was caused by an accident arising out of and in the course of his employment with H.D. Lee."[4]

The claimant's medical evidence was in some respects equivocal. Basically, the claimant proceeded on the assumption that the stress and anxiety of his work had

---

**3.** See also *Fireman's Fund Indemnity Co. v. Industrial Acc. Comm'n,* 241 P.2d 299 (Cal.App. 1952), aff'd, 39 Cal.2d 831, 250 P.2d 148 (1952) (65 days of tension and anxiety while negotiating a labor contract caused a stroke and paralysis); *Insurance Department of Mississippi v. Dinsmore,* 233 Miss. 569, 102 So.2d 691 (1958), aff'd on rehearing, 233 Miss. 569, 104 So.2d 296 (1958) (mental and emotional strain of employ-

ment aggravated employee's preexisting hypertension and caused a stroke, which was held to be a compensable injury); see generally, A. Larson, Workmen's Compensation Law § 42.21, pp. 7–586—7–601 (1987).

**4.** Dr. Courter responded as we have indicated without objection.

brought on a stroke. Dr. Kilbane testified that the claimant had vascular disease prior to 1982 and was predisposed to, i.e., more likely than a normal man, to experience a stroke. Some of the claimant's medical records suggested that in July 1982, the claimant might have been suffering from some "demyelinating type disorder" which "would probably get into the field of Parkinsonism or some disease like that." [5] It is true that if an accident activates or accelerates a pre-existing disease or condition, it is compensable. *Cowick v. Gibbs Beauty Supplies,* 430 S.W.2d 626, 630[5] (Mo.App. 1968). Nevertheless, the claimant's medical proof of causation, even uncontradicted, would not compel a finding that the stress and anxiety of his work place precipitated his stroke.

Recognizing that the defendants' medical evidence, if accepted, would furnish a basis for the Commission's finding, the claimant contends that for several reasons the employer and insurer's medical evidence was improperly received. The claimant's objections to the defendants' medical evidence are collectively stated in his Point III as:

"... The Commission erred in overruling claimant's objections and considering as substantive evidence the deposition testimony of Drs. McAlhany and Martin because the objected-to testimony was irrelevant and immaterial, incompetent, and called for speculation and conjectionre [sic], and was improper examination of an expert witness, in that the doctors lacked personal knowledge of the claimant's conditions of employment and claimant's immediate post-stroke physical condition, the physicians were never presented with a hypothetical question, and the factual basis upon which the doctors' opinions rested were never disclosed."

We are in doubt that the claimant's objections to the defendants' medical evidence have been properly preserved for review. Nevertheless, we shall give brief considera-

tion to the claimant's objections to the defendants' medical evidence, as we understand them. As to the testimony of Dr. McAlhany, claimant here contends that: 1) Dr. McAlhany's testimony was incompetent because he was not asked about the claimant's work environment; 2) Dr. McAlhany was not asked a hypothetical question, particularly a question including the job stress factor, and 3) Dr. McAlhany based his opinion in part on a report from the insurer. It is first necessary to consider Dr. McAlhany's testimony.

Howard J. McAlhany gave a deposition in this proceeding on February 13, 1985. This physician testified that for 30 years, he had practiced neurosurgery. Dr. McAlhany was retired from the active clinical practice of neurosurgery, but he was board certified therein. He was or is a member of the Southern Neurosurgical Society and the Congress of Neurological Surgeons.

Dr. McAlhany had examined the claimant on two occasions. On July 24, 1961, Dr. McAlhany examined the claimant at the request of a state agency, for the assessment of seizures. On October 25, 1983, Dr. McAlhany examined the claimant at the request of the insurer in this case. The claimant's wife accompanied the claimant to the doctor's office, and jointly they related the details of the occurrence of January 21, 1982, which, the claimant maintains, constituted a compensable accident. Dr. McAlhany was aware of the claimant's previous hospitalizations at which times nuclear brain scans and other tests were performed. In 1982 an electroencephalogram and a CAT scan were reported as being normal. Dr. McAlhany admitted he had not personally reviewed the CAT scan; the information that it was normal had been sent to him by the insurer.

Dr. McAlhany then conducted an assessment of the claimant's neurological function. The examination included an examination of the carotid pulse for abnormal

---

**5.** A "demyelinating" disease has been described as a disease which destroys or removes the myelin sheath of a nerve or nerves in a patient. Apparently, a demyelinating disease may produce paralysis, pain, limitation of physical

movement and mental anguish. *Hitchcock v. United States,* 479 F.Supp. 65, 67 and n. 2 (D.D. C.1979); The Sloane–Dorland Annotated Medical–Legal Dictionary 212 (1987).

noise or bruit, which may indicate disease in the blood vessels of the neck; testing of the functions of the twelve cranial nerves; assessment of the sensory modalities, which include sensitivity to light touch, pain perception, sensitivity to vibration, which is tested with a tuning fork and position sense at the toes. Also assessed were the claimant's cerebellar functions, the cerebellum being that part of the nervous system which concerns itself with equilibrium, stability and coordination. The claimant's deep tendon responses were tested. His station and gait were also observed and evaluated. The only abnormal symptom detected by Dr. McAlhany was a slight diminution of claimant's sensitivity to light touch in the right arm and right leg.

Dr. McAlhany concluded that the claimant's condition was not work related and entertained considerable doubt whether the claimant had ever had a true stroke. For emphasis, we repeat two or three questions asked and the answers given by Dr. McAlhany:

"Q. All right. Were you asked to determine whether or not you had an opinion as to whether this injury, this alleged stroke, was job related?

A. Yes. That question was posed. And in my opinion this was not work related.

Q. Why is that, sir?

A. Because the most important factor in a stroke is the blood pressure. These things happen to people in their sleep, when a person is driving a car, when he's shopping for groceries. And I do not feel that work duties relate to the development of a stroke. And there's considerable doubt in my mind that this individual ever had a true stroke."

Dr. McAlhany's evidence constitutes an ample basis for a finding that the claimant's injury was not job related.

As to the claimant's objections to the reception of Dr. McAlhany's testimony and his argument that it should have been rejected in toto, we again note those objections as developed in the "argument" part of the claimant's brief under Point III.

The claimant insists that Dr. McAlhany's testimony was incompetent because he was not asked about the claimant's work environment and was not asked a hypothetical question, particularly one including the job stress factor.

■■■ The controlling rules have often been stated. As a medical expert, Dr. McAlhany was entitled to give his opinion: 1) based on facts within his own personal knowledge and observation or 2) based upon an hypothetical question based wholly upon facts testified to by other witnesses or 3) based partly upon knowledge and partly upon facts shown by the testimony of others. *Prince v. Metropolitan Life Ins. Co.*, 235 Mo.App. 168, 174, 129 S.W.2d 5, 8 (1939). It is true that an expert's opinion must have in support of its reasons and facts supported by competent evidence which will give the opinion sufficient probative force to be substantial evidence, and if the expert does not have personal knowledge of those facts he must be asked by use of a hypothetical question to assume the truth of them. *Harp v. Illinois Central Railroad Company*, 370 S.W.2d 387, 391 (Mo.1963). However, as noted in *Harp* and a good many other cases, although a physician may not base his opinion on the previous history as received from his patient because such a history is within the hearsay rule and therefore is not a proper foundation, nevertheless if the history given the physician is made up of facts which in themselves are competent evidence, and which are in evidence, any objection to the use of the history as a basis for the expert's opinion is ill taken. *Harp v. Illinois Central Railroad Company*, 370 S.W.2d at 393; *Huffman v. Terminal Railroad Ass'n of St. Louis*, 281 S.W.2d 863, 871[10, 11] (Mo.1955); *Oesterle v. Kroger Grocery & Baking Co.*, 346 Mo. 321, 326, 141 S.W.2d 780, 782 (1940).

■■■ In the case before us, Dr. McAlhany was given a history which included the occurrence claimant now asserts was a compensable accident and contrary to the claimant's assertion, it is apparent Dr. McAlhany relied on that history. It is apparent from a reading of the whole record

that the history given to Dr. McAlhany was made up of facts which in themselves were competent evidence and which were in evidence, and Dr. McAlhany's opinion as to the cause of the claimant's stroke, based on his examination and the history given him by the claimant and his wife, was properly received in evidence. Dr. McAlhany did testify to the significance of a CAT scan which he had not seen and perhaps his testimony concerning the CAT scan should not have been received. While incompetent evidence will not support an award of compensation, the admission of incompetent or otherwise inadmissible evidence will not justify setting an award aside in a case where there is substantial, competent evidence to support it. *Wills v. Berberich's Delivery Co.*, 339 Mo. 856, 860, 98 S.W.2d 569, 571 (1936); *Jackson v. Curtiss–Wright Airplane Co.*, 334 Mo. 805, 813, 68 S.W.2d 715, 719 (1933); *Vickery v. ACF Industries, Incorporated,* 454 S.W.2d 620, 623 (Mo.App.1970). There was substantial evidence to support a finding that the claimant's injury was not job related, aside from Dr. McAlhany's comment upon the CAT scan he had not seen.

By his Point IV, the claimant asserts that the deposition of Dr. Clarence Martin, introduced by the employer and insurer, should not have been received in evidence. We need not discuss the deposition of Dr. Clarence Martin, which was offered by the defendants. In general, it is favorable to the defendants' position, but it is not as extensive as Dr. McAlhany's deposition, which in itself constitutes a basis for the Commission's award. As we have held, medical proof of causation is essential in a case of this kind and the employer and insurer had competent and substantial evidence that the stress and anxiety to which the claimant was subjected at work was not the cause of his condition. When the ultimate question upon which the right to compensation depends largely resolves itself into which of two conflicting medical or scientific theories should be accepted, such issue is peculiarly for the determination of the Commission. *Vollmar v. Board of Jewish Education,* 287 S.W.2d 868, 872[4] (Mo.1956); *Ham v. Sikeston Con-*

*crete Products,* 735 S.W.2d at 429; *Conrad v. Royal Brokerage Co., Inc.,* 612 S.W.2d 13, 14–15[2] (Mo.App.1980).

The award of the Commission is affirmed.

PREWITT, Acting P.J., and MAUS, J., concur.