MARY V. ALADITS, PETITIONER-APPELLANT, v.
SIMMONS COMPANY, DEFENDANT-RESPONDENT.

Argued February 7, 1966—Decided May 2, 1966.

116

Mr. *Brian D. Conlan* argued the cause for appellant (*Messrs. Gurry and Conlan,* attorneys).

Mr. *Isidor Kalisch* argued the cause for respondent.

The opinion of the court was delivered by

FRANCIS, J. This is a heart death workmen's compensation case. The Division of Workmen's Compensation decided in favor of petitioner. The County Court reversed because it found the proof inadequate to sustain the award. The Appellate Division affirmed the reversal on the ground that the state of the record was such as to justify the conclusion reached by the County Court. We granted certification. 46 *N. J.* 55 (1965).

Prior to his death on January 25, 1960, William Aladits had been in the employ of respondent Simmons Company for about 20 years. He was described as a broad shouldered, rugged man, six feet tall and weighing about 190 pounds. He had never been ill during his work for respondent. The only employment time he ever lost came from a sore ankle and a tooth extraction. He was 48 years of age at the time of his death, married and the father of two children. He worked as a loader in the shipping department. The work was heavy. He and a fellow employee operated as a team. His task was to obtain mattresses, box springs and sofas from various places of storage in respondent's warehouse, load them on a truck or skid, which he then pushed or pulled to a place where the articles were loaded on trailers for shipment. The truck or skid was about seven feet long, three feet wide and weighed about 200 pounds, and it had two metal posts and a cross-piece at one end. The mattresses weighed from 65 to 90 pounds; the box springs approximately the same. Sofas came in different sizes and weights, ranging from 150 to 600 pounds. Each truck would hold about ten mattresses or box springs; the sofas being larger and heavier would fill it more quickly. At times the mattresses and box springs were stacked in the warehouse in piles 14 or 15 high. In such

instances the loader would reach up and pull a corner of the article out far enough to enable him to drop it on the truck. Occasionally because of the location of the stack the loader would have to carry a box spring or mattress 20 feet to place it on the truck. Sometimes when an order called for 20 mattresses or box springs Aladits would take two trucks to the points of storage, load them and push one and pull the other to the location of the trailers. The fellow worker's task was to load the items on the trailer. A trailer load was usually close to 100 pieces.

On January 25, 1960 when Aladits left home at about 6:40 A. M. he appeared to be in perfect health. Around 11:45 A. M. Mrs. Aladits was informed that he had died at work.

The proof showed that Aladits began his usual loading task at 7:00 A. M. Between that hour and 9:30 A. M., coffee-break time, he and his co-worker had loaded two trailers with mattresses and box springs. Assuming ten such articles to a full truck or skid and 100 to a trailer load, this would mean Aladits had moved 200 mattresses and box springs from their place of storage to his truck and pushed or pulled the loaded truck 20 times from the place of storage in the warehouse to the location of the trailer (a distance not appearing in the record, although it was said that at times it would be necessary to travel the distance of a block or a block and a half within the warehouse to obtain material for loading.) On this assumption also, over the two and one-half hour period, he had loaded the truck, moved it to the trailer location and back to the warehouse storage place every seven and one-half minutes.

After the coffee-break Aladits resumed work. At about 10:00 A. M. his 16 year old daughter brought lunch to him as was her custom. When she handed him the lunch, he said he did not feel well and asked her to tell her mother that he would be home in a "little while"; he was going to ask one of his superiors if he could go home. The young lady said her father was a quiet man who was "not much for talking to anybody." If he did not feel well he would try to help him-

self without talking about it. But if he was in "real distress" he would mention it. This testimony was not objected to by respondent and rightly so. In context it has all the indicia of trustworthiness. The statement was a natural one between father and daughter; there was no aspect of artificiality or ulterior motive or design about it. The circumstances clearly exclude any suspicion of an intention on Aladits' part to create evidence for future use; in fact they envelop the statement with an unclouded aura of truth. Although hearsay, the testimony was properly introduced and usable in evaluating the compensability of the death. *Cf. State v. Thornton,* 38 *N. J.* 380, 389 (1962), *certiorari* denied 374 *U. S.* 816, 83 *S. Ct.* 1710, 10 *L. Ed. 2d* 1039 (1963); *Gilligan v. International Paper Co.,* 24 *N. J.* 230 (1957); compensation award denied on remand, *sub nom. Kasiski v. International Paper Co.,* 58 *N. J. Super.* 353, 369 (dissenting opinion) (*App. Div.*), reversed, *per curiam,* on basis of dissenting opinion, 31 *N. J.* 267 (1959); *Kopitnikoff v. Lowenstein Bros., Inc.,* 24 *N. J. Super.* 434 (*App. Div.* 1953); *Rainess v. Grant Finishing Co., Inc.,* 132 *N. J. L.* 422 (*Sup. Ct.*), affirmed 133 *N. J. L.* 611 (*E. & A.* 1945).

Aladits continued working after his daughter's visit. When the fatal event occurred around 11:30 A. M. a third trailer had been loaded except for three mattresses. He had left the trailer with his truck to obtain them. About five minutes later his partner was advised that Aladits was lying on the floor. The partner found him there about 40 yards from the trailer and about ten feet from his truck. The pile of mattresses from which he was to obtain the three needed to complete the trailer loading was ten to 15 feet from the truck. Aladits was dead. No autopsy was performed. The death certificate signed by the county physician gave the cause of death as coronary occlusion.

A specialist in internal medicine testified in behalf of petitioner. He had not known decedent nor did he examine the body. His opinion as to causal relation between the work effort and the death was given in answer to a hypothetical ques-

tion which substantially incorporated the facts outlined above. In answer he said the cause of death was undoubtedly a major coronary attack. In the absence of an autopsy, however, it would be difficult to say whether the type of heart attack was coronary insufficiency, an occlusion or thrombosis. The doctor opined that the work decedent did on the morning of January 25, 1960 was a major contributing factor in initiating the coronary attack. On the basis of the daughter's testimony he felt the attack started about 10:00 A. M. when Aladits told her he was not feeling well. And in the doctor's judgment continuance of the heavy type of physical exertion in loading the trucks increased the severity of the attack to the extent that it resulted in death. In sum his view was that the cumulative effect of the work effort before 10:00 A. M. initiated the heart attack and continuance of the effort thereafter increased its extent and severity to the point of fatality.

Respondent likewise produced one medical witness, a specialist in internal medicine and cardiology. He too had never seen Aladits, and so his testimony took the form of answers to hypothetical questions. His conclusion on the facts presented to him was that the cause of death is unknown and speculative. He recognized that about 50 per cent of sudden death cases are due to coronary occlusion, but he said without an autopsy in this case it would be mere conjecture to say Aladits' death was one of the coronary type rather than one of the other 50 per cent[1]. He placed stress on the fact that the hypothetical question made no reference to any past history of cardiac disease or of any complaints or anything else which would lead him to give the cause of death. In further explanation he testified:

"This man, for twenty years, or approximately that time, was employed by this company in a similar capacity. We know that—at least

[1] Statistics show that approximately 50 per cent of all deaths are attributable to cardiovascular renal disease. When limited to a survey of *sudden* deaths the percentage must be substantially higher. United States Dept. of Health, Education and Welfare, *Vital Statistics of the United States*, Vol. II, *p.* 7–384 (1963).

we can assume that at 10:00 in the morning he was well. He was given a lunch pail or a lunch package by his daughter. He made no complaints in the morning. All we know is that somebody found this man dead. And I would deny causal relationship on these facts."

It was pointed out on cross-examination that the hypothetical question put to him by respondent made no reference to Aladits' daughter's testimony respecting her father's statements at about 10:00 A. M. that he was not feeling well, that he was going to ask his superior for permission to go home early, and that she should tell her mother he might be home early. The doctor said, however, he did not consider such complaints sufficiently informative to suggest a heart disturbance. In the absence of facts indicating a stress or strain incident, or that the work effort was unusual, or that Aladits had to "rush" that morning, he would not find any work connection with the death. He would concede that a person with heart disease could develop a strain from an individual heavy incident. But where the work effort being pursued at the time of death was the laborious work regularly engaged in, in his opinion there would be no causal connection between the effort and the collapse.

The Judge of Compensation concluded on the basis of *Dwyer v. Ford Motor Co.*, 36 *N. J.* 487 (1962), that the facts demonstrated sufficiently a material relation between the heavy work effort engaged in on the fatal morning and the death. The County Court disagreed, holding that both the cause of death and the relation between it and the employment strain were purely speculative. Consequently he denied compensation benefits because petitioner had failed to carry the required burden of proof.

This was an unwitnessed death. No one knows just what Aladits was doing or what signs or symptoms he manifested when stricken. It is known that he was in the course of his work, that it was heavy work and that he had been doing it for about four and one-half hours before he collapsed. In such cases causal connection between the work effort and the death must depend upon circumstantial evidence. It is a

matter of common knowledge also, that in such cases justice requires a more tolerant appraisal of the evidence supporting the thesis of causation. Although the standard to be met for compensability remains the same, where the "collapse is unwitnessed and the employee's lips are sealed by death, the courts throughout the country show an understandable readiness" to find the necessary reasonably probable connection on a less formidable *quantum* of testimony. See, *Gilligan v. International Paper Co., supra,* 24 *N. J.,* at *p.* 235; *Williams v. Corby's Enterprise Laundry,* 64 *N. J. Super.* 561 (*App. Div.* 1960).

The County Court in denying recovery relied in large measure upon *Wilsey v. Reisinger,* 76 *N. J. Super.* 20 (*App. Div.*), certif. denied 38 *N. J.* 610 (1962), believing the facts there to be very similar to those present here. Basically the evidence in *Wilsey* showed the sudden collapse and death of an ostensibly healthy man while engaged in his usual fairly strenuous work. There was no autopsy and no evidence of any abnormal condition or physical distress before the collapse. In this situation the Appellate Division found no support for the conclusion drawn by the petitioner's medical witness that the work produced or contributed to the sudden death.

In applying that case to this one the County Court overlooked a significant differentiating feature. Here we have an apparently strong, healthy man leaving for work about 6:40 A. M. After about three hours of fast moving, heavy employment effort — albeit his regular employment strain, so far as the record shows—we find him complaining to his daughter about not feeling well, saying he was going to seek permission to go home early, and asking her to tell her mother he might be home early. This testimony was more significant than the mere words might indicate. Aladits was a taciturn man; "he was not much for talking to anybody." If he did not feel well he would try to help himself without talking about it. Only if he was in "real distress" would he complain. Obviously the probative force of the complaints

coming from this man, under all the circumstances attending his collapse, must be deemed substantial. No such factor was present in *Wilsey*.

Apparently Aladits did not ask to go home after his daughter left. He went back to his labors. Whether it was his intention to continue until the lunch period will never be known. But the complaint of this type of man takes on added significance, even for a layman, when it is followed by an hour and a half of continued effort and his sudden collapse and death. And when a specialist in internal medicine after considering the complaint in the context of the collapse opines that Aladits was probably undergoing a heart attack at about 10:00 A. M., his statement has rational evidentiary capacity. If the doctor's view is accepted that a heart attack was ongoing at 10:00 A. M., and on all the facts we cannot say the opinion is unreasonable and should not be accepted, it becomes obvious that when Aladits resumed his loading endeavors, the strain involved in terms of impact on him was no longer the usual one. As the doctor indicated it was too great for his condition to withstand; so it intensified the heart attack as he continued his work to the point where the collapse and death ensued. In our judgment this is a rationally acceptable conclusion.

This is not an easy case for decision. It cannot be expected that unwitnessed heart death cases will be accompanied by a wealth of relevant and competent proof. Heavy reliance must be placed on the surrounding circumstances, and they must be carefully explored and appraised for the existence of every fact or element which points the way toward or away from work connection. As we said in *Dwyer, supra,* the problem involved in this type of case is essentially a medical one, and courts must rely in large measure upon the competency and good faith of the medical profession. And we hoped after *Dwyer* that the profession would be able to furnish some standard criteria uniformly recognized which would assist us in our task. That hope has not materialized; perhaps no such criteria have yet been realized or accepted

by the internists and cardiologists. Until they are established we must proceed as best we can. 36 *N. J.*, at *p.* 512. As the Chief Justice observed in his concurring opinion in *Dwyer*:

"When the possibility of causal connection is accepted, we cannot deny relief in all cases simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope their decisions square with the truth, and with a willingness to consider in succeeding cases whatever contribution scientific advances may offer." 36 *N. J.*, at *p.* 516.

The course of decision in this case and the evidence bearing upon the issue of compensability were such that we felt obliged in the interest of justice to undertake an independent review of the record. Having done so, we are satisfied that the circumstances proved and the inferences fairly drawn therefrom, in their totality warrant the conclusion that Aladits died of a coronary ailment and that the employment strain to which he was subjected after 10:00 A. M. on January 25, 1960, in reasonable probability contributed in substantial measure to his fatal coronary incident. Therefore his widow and children are entitled to the statutory compensation benefits.

Although we have concluded in this case that the death arose out of and in the course of employment within the framework of *Dwyer v. Ford Motor Co., supra,* we find it necessary once again to call to the attention of the Judges of Compensation and the members of the bar the necessity for more adequate statements and explanations by expert medical witnesses of their reasons for attributing heart collapses or failures or deaths to the employment strain. We said in *Dwyer,* and we repeat:

"The legal conclusion of cause and effect is ordinarily dependent upon evidence of medical causation advanced by physician witnesses in the form of opinion based upon the facts and circumstances attending the heart attack. But we repeat that the *mere* assertion of reasonably probable contributory work connection by a medical witness cannot justify an award. The facts of the situation under examination in

their totality must demonstrate causality by the greater weight of the credible evidence. In this area the reasons for the assertion are more important than the assertion itself. * * * Explanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect must generally be regarded as indispensable. The facts and circumstances surrounding the work effort and the heart attack, the medical opinion as to connection between the two, and the explanation of the connection from a medical viewpoint must coalesce in support of a finding by the greater weight of the evidence that the effort was at least contributorily responsible in some material way for the attack." 36 N. J., at pp. 494–495.

We said also that the delicate nature of the judicial task in passing upon the issue of causal connection is the "reason why the law must underline so heavily the *demand* that the medical experts describe the operative factors which have led to their conclusions." 36 N. J., at p. 512.

■ In order to evaluate fairly a medical expert's opinion that a heart attack was caused or contributed to by the employment within the *Dwyer* principle, a court should have answers to (1) why the work strain or effort caused or contributed to the attack, (2) how it caused or contributed, (3) what were the physiological mechanics which followed in the wake of the strain or effort which demonstrate that the attack was probably related to the strain or effort, (4) what went on within the employee if the strain or effort precipitated or contributed materially to the attack, (5) what, if any, signs or symptoms might be expected to accompany the heart attack or appear immediately thereafter which a layman might observe, or which a doctor might observe or regard as significant, etc. As was said recently in another context, but which is pertinent here also: "[T]he agency [and the parties] should realize that a court cannot review something the court cannot understand. The record must speak in terms and details that strangers to the subject can comprehend." *Garden State Farms, Inc. v. Hoffman,* 46 N. J. 595 (1966).

In this case the medical testimony could have been considerably more explicit and instructive. In future controversies we shall expect more details and further enlighten-

ment. On the whole record now before us, however, including particularly the lay testimony, we hold the view that the greater weight of the evidence demonstrates with reasonable probability the required contributory causal connection between Aladits' work effort and his fatal heart attack.

Accordingly the judgment of the Appellate Division is reversed and the award of compensation in the Division of Workmen's Compensation is reinstated.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For affirmance*—Justice HALL—1.