DORA MEINES, PETITIONER-APPELLANT, v. HY LEVINE ASSOCIATES, RESPONDENT-RESPONDENT.

Argued April 27, 1971—Decided June 28, 1971.

*Mr. Reginald F. Hopkinson* argued the cause for appellant (*Messrs. Jeffer, Walter, Tierney, De Korte, Hopkinson & Vogel,* attorneys).

*Mr. Kenneth J. Fornabai* argued the cause for respondent (*Messrs. Fornabai and Hogger,* attorneys).

The opinion of the Court was delivered by

FRANCIS, J.    This is a heart death workmen's compensation case. The Division of Workmen's Compensation dismissed the claim on the ground that petitioner had failed to prove by the preponderance of the evidence that the fatal heart attack was causally related to decedent's work. The County Court found that the requisite causal connection had been established, and it accordingly reversed and remanded for an award of compensation. After further proceedings in the Division for the computation of the judgment, an appeal was taken to the Appellate Division where in an unreported opinion the County Court was reversed and

the Division's dismissal reinstated. This Court granted certification. *Meines v. Hy Levine Associates,* 58 *N. J.* 23 (1971).

On December 13, 1965 at about 3 P. M. decedent William Meines, petitioner's husband, suffered his fatal heart attack during the course of his work as a carpenter for respondent. He was 62 years of age at the time. Five years earlier he had an apparently severe heart attack which confined him to bed for six weeks and incapacitated him for work for six months. Nitroglycerin tablets were prescribed and he was instructed by his physician to keep them with him at all times. It is undisputed that these pills are prescribed for persons who suffer from coronary artery disease, particularly angina pectoris. During the ensuing years after his return to work he remained under the care and observation of two doctors, one who was the treating physician and the other who took electrocardiograms. According to Mrs. Meines, her husband was advised to eat fat-free food. Unfortunately both of decedent's doctors died prior to the trial of the case.

On the day of the accident Meines arose at his usual time, around 6:30 A.M., had his breakfast, made no complaints of any kind to his wife, and left for work. At the time, his employer was engaged in remodeling the large old building of the Roback Furniture Company in Paterson, N. J.

Meines began his labors as a carpenter at 8 A.M. He worked on a scaffold six or eight feet above the ground from that time until 12 noon. His task was to nail 18 inch two-by-four studs for purposes of support between eight foot two-by-four studs already in place. A fellow worker on the ground nearby cut the studs to the proper size and placed them on the scaffold thus keeping a constant supply on hand. The partition being worked on was approximately 100 feet long. A number of two and one-half inch nails were hammered into each stud. In hammering the nails, decedent was required to reach from the scaffold and the operation was described by the fellow worker as being more strenuous than some of the carpenters' usual tasks. This worker said also that most

carpenters are more relaxed working on the ground than on a scaffold.

There was no heat of any kind in the building and Meines kept his jacket on while working. According to the local Weather Bureau report (of which we take judicial notice), there were .71 inches of rain during the day, all but .04 inches occurring before 1 P.M. Meines picked up the studs from the scaffold, put them in place and hammered steadily during the four hours from 8 A.M. to 12 noon. There is some indication that in his capacity of shop steward he climbed down from the scaffold on a few occasions to see what other men were doing, then climbed back and resumed working. At any rate the fellow worker testified that no complaints of physical discomfort were voiced by decedent in that period. He had been on one other job with Meines before this day, and based on that experience, albeit limited, he said Meines was a quiet type and not a complainer. That description squares with Mrs. Meines's testimony that her husband did not take the nitroglycerin pills very often; he said that he did not need them.

At noon the men took a half hour lunch break. During that half hour Meines made no complaints, but the fellow worker saw him take a nitroglycerin tablet. At 12:30 the men returned to their tasks and Meines continued the steady hammering until 2:30 when he asked the fellow worker to relieve him so he could go to the men's room. A half-hour later when he had not returned, the associate went looking for him and found him a short distance away slumped over between partitions An ambulance was called but on arrival the doctor pronounced Meines dead. The death certificate gives the cause of death as arteriosclerotic heart disease. Both of the specialists in internal medicine who appeared as experts for the parties at the hearing added that the immediate cause of death was an acute myocardial infarction. The difference between them was that one declared the infarction causally related to the work effort, while the other said it

was due to the natural progress of the underlying coronary arteriosclerosis.

Dr. Rowland D. Goodman, the internal medicine specialist who testified in behalf of petitioner, regarded the lunch-time taking of the nitroglycerin tablet as of crucial significance. He said such pills are prescribed for the relief of angina pectoris pain brought on by coronary artery disease. Patients are instructed to take them when needed, that is, when anginal chest pain develops. They are not taken routinely. It was the doctor's view that when a patient has preexisting arteriosclerotic heart disease to the degree that he requires nitroglycerin and he dies suddenly, it is most probable that the death resulted from an acute myocardial infarction stemming from his underlying heart disease.

In explaining the physiological mechanics of the infarction he said that in arteriosclerotic heart disease the coronary arteries are lined with atheromatous plaques. When the patient exerts himself, "as this patient did," there are physiological responses to the exertion. These consist of an increase in the heart rate and, therefore, a greater velocity of the blood flowing through the coronary arteries. When this occurs and a plaque breaks off followed by occlusion of a coronary artery because of formation of a clot there, the cardiac tissue dies and this is known as an infarction. The size of the plaque is important. Only one portion of it may break off at the point of attachment, in which event the clot will occur there. Or it may break off and flow down the artery and then cause the occlusion. Depending upon the location of the occlusion and the amount of coronary tissue involved, the patient may or may not survive. In his opinion, the process just described happened in this case, and the terminal result was that a massive myocardial infarction occurred causing unconsciousness and almost immediate death.

The doctor said, and we believe the statement has substantial probative value under the circumstances, that the taking of the nitroglycerin pill during the lunch period

meant to him that Meines was undergoing chest pain and was experiencing a coronary episode. It is not necessary to decide whether the almost four hour work effort of the morning so adversely affected the underlying preexisting coronary artery disease so as to produce the chest pain. The fact that he had the pain and that it indicated an ongoing coronary problem is clearly supported by the evidence. At this point, according to Dr. Goodman, rest might have helped him. Instead, Meines climbed back on the scaffold at 12:30 and resumed his work effort. Thereafter he nailed the studs in place with a hammer steadily for two hours until he desisted to go to the bathroom. When this happened, death was only minutes away.

On these facts Dr. Goodman said Meines was already "in the throes of the myocardial infarction" when he returned to work and the effort required thereafter during the two hour period further aggravated the episode and thus contributed to the massive infarction which resulted in death.

Dr. Jack S. York, the respondent's expert, asserted that the fatal attack resulted only from the natural progression of coronary arteriosclerosis. He agreed that decedent had the underlying coronary artery disease and that he died of an acute coronary occlusion. He conceded that the work Meines had been doing during the day was vigorous activity and that it would be one significant factor in the case. The doctor testified that he did not know what the taking of the nitroglycerin pill at noontime signified. That was because such pills can be taken in two ways, "prophylactically three or four times a day either before or after meals, * * * [whereas] some patients only take it when they have angina." In our judgment that statement overlooked a very significant factor here, *i. e.*, the plain indication that Meines took nitroglycerin only when he needed it.[1] The doctor agreed that

---

[1]The importance of nitroglycerin pills to heart disease sufferers frequently appears in heart death workmen's compensation cases. See *Dwyer v. Ford Motor Co.*, 36 *N. J.* 487, at 499–502, 508 (1962) ; *Walck v. Johns-Manville Products Corp.*, 56 *N. J.* 533, at 545, 566 (1970).

if the pill was taken because of the presence of chest pain, it could mean that a coronary attack had commenced and continued until the fatal attack; "[s]ometimes it [the pill taking] indicates the start of an infarction but not always." Finally he was asked this question:

Q. Dr. York, if you assumed that William Meines was having chest pains or further * * * that at twelve o'clock there was the beginning of a coronary, in view of his being a carpenter and this vigorous activity, would you then have the opinion * * * that that activity would contribute to the cardiac that caused his death?

A. I think it would. Yes.

As reported above the judge of compensation found that Meine's work was very light and that his effort played no significant part in bringing about his death. On appeal, the County Court referred to the testimony that the taking of the nitroglycerin tablet indicated "a need for it, that a heart attack had commenced, and that returning to his work aggravated his condition as a matter of reasonable medical probability." After pointing to the basic rule that an employer takes an employee or continues him in employment subject to all his underlying weakness and disease, the court noted that the test of compensability is whether the work effort in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and death. It then found that under the circumstances disclosed by the evidence the exertion was too great for Meines and the fatal attack was therefore compensable.

Apparently in view of the conflicting decisions below, the Appellate Division decided to engage in a *de novo* review. After doing so, it concluded that there was no evidence in the record to sustain the conclusion that the heart death was employment connected. There was no specific discussion or finding as to whether resumption of work and continuance thereof for two hours aggravated an ongoing coronary episode. Our own review of the record convinces us that considering the proofs as a whole the findings of

the County Court could reasonably have been reached on sufficient credible evidence. But more than that the evidence in the whole case so clearly preponderated in favor of petitioner as to require the conclusion that the Appellate Division was manifestly mistaken in finding contrary to the County Court.

The test of compensability in cases such as this was laid down in *Dwyer v. Ford Motor Co., supra,* 36 *N. J.* 487. There it was said that the compensation claimant

> has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of "some material degree" cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than *de minimis;* it means that there was some employment exertion capable medically of helping the attack — of furthering its progress. 36 *N. J.* at 493–494.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> If the effort or strain, whether great or little, was an incident of the employee's work and either alone or in combination with disease played a material part in causing, contributing to or accelerating a heart attack, the attack is compensable. *Id.* at 497.

*Dwyer* declared also that in administering the Workmen's Compensation Act, the law does not consider the state of a workman's heart, *i. e.,* whether sound or far gone in disease, at the time it is subjected to work effort, as a crucial criterion in the determination of his right to benefits for a heart attack. No standard of health is required of an employee and the employer takes him as he is. *Id.* at 512. *Dwyer* provides one additional conclusion of particular relevance in this case. The opinion makes it perfectly plain that if an employee with a diseased heart comes to work in the throes of a heart attack or continues to work after the commencement of such an attack, and the work effort, whether it be great or small, contributes in a material way to the aggravation or acceleration of the condition resulting in death, the case is compensable.

*Aladits v. Simmons Co.*, 47 *N. J.* 115 (1966), also a death claim, presented a comparable situation to the present one. Facts were introduced in that case which justified an inference that after working for a few hours in the morning, around 10 A. M. Aladits began to suffer a heart disturbance. After a short conversation with his daughter he returned to his regular rather laborious work. After about an hour and a half of continued effort loading a trailer he walked some distance—about 40 yards—to pick up some further articles for loading. Five minutes later he was found dead on the floor. The medical diagnosis was coronary occlusion. The expert testimony was to the effect that the continuance of the physical exertion after the onset of the heart disturbance increased the severity of the attack to the extent that it resulted in death. Compensation was allowed, this Court saying:

If the doctor's view is accepted that a heart attack was ongoing at 10 :00 A.M., and on all the facts we cannot say the opinion is unreasonable and should not be accepted, it becomes obvious that when Aladits resumed his loading endeavors, the strain involved in terms of impact on him was no longer the usual one. As the doctor indicated it was too great for his condition to withstand; so it intensified the heart attack as he continued his work to the point where the collapse and death ensued. In our judgment this is a rationally acceptable conclusion. 47 *N. J.* at 123.

In the present case, in our opinion, fair analysis of the medical testimony in light of the circumstances produces a conclusion heavily in favor of the view advanced by petitioner's internist, of causal connection between the work effort and Meine's death. On the whole record, the preponderance of probabilities so clearly supports the justice of an award of compensation that the County Court judgment must be sustained.

Accordingly, the judgment of the Appellate Division is reversed and the monetary award entered in the Workmen's Compensation Division following the remand for that purpose by the County Court is reinstated.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.