Hillsborough
No. 78-120

NEW HAMPSHIRE SUPPLY COMPANY, INC. & a.

v.

EDITH STEINBERG & a.

April 13, 1979

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*E. Donald Dufresne* orally), for the plaintiffs.

*Green & Green*, of Manchester (*Leonard S. Green* and *Jon Groetzinger, Jr.*, orally), for the defendants.

LAMPRON, C.J.   This is a claim for workmen's compensation benefits for a death resulting from a heart attack. The deputy labor commissioner found that the decedent's employment caused his heart attack and awarded benefits pursuant to RSA 281:22. The New Hampshire Supply Company and its insurance carrier, the Insurance Company of North America, appealed the decision to the superior court. After a trial de novo, the superior court ruled that there was insufficient medical proof to establish that the deceased's heart attack was caused by his employment. Accordingly, workmen's compensation benefits were denied. Mrs. Steinberg, the claimant, excepted to the trial court's holding, and all issues were reserved and transferred by *Dunfey*, J. We remand.

The decedent, Morton Steinberg, had worked at the New Hampshire Supply Company [hereinafter N.H. Supply], a distributor of plumbing and heating supplies, for the sixteen years preceding his death. He was a part owner of the company and worked in an executive capacity, being responsible for all aspects of the business except for the finances.

In early 1973, N.H. Supply began negotiations with TDA Industries concerning a possible merger. Steinberg, in addition to his regular duties, represented N.H. Supply in the merger talks. As a result of the negotiations, he often worked twelve or more hours per day. His wife testified that during this period Steinberg was very tired, that when he came home he would not eat but went right to bed, that his personality changed and he became exceedingly tense. The long hours continued during the nine months of the merger negotiations, until the merger was successfully completed in September 1973.

One of the requirements of the merger was that Steinberg remain with the merged company. After the merger, Steinberg's work intensified instead of abating. He worked harder, put in longer hours, and his family saw him less than before. In addition to taking care of the financial responsibilities of the company, he was placed in charge of the parent company's Occupational Safety and Health Authority (O.S.H.A.) compliance. This new responsibility required him to travel throughout New England at different times to inspect the fourteen stores of the merged company.

In March 1974, Steinberg had to undertake inventory. This inventory had to be completed by the end of the month, and Steinberg was forced to hire and supervise additional personnel. As a result, a great amount of pressure was placed upon him. The inventory process lasted the entire month of March, and it was usual for Steinberg to work twelve- to fourteen-hour days, seven days a week. The deadline for the completion of the inventory was met at the end of March and Steinberg then began pricing the items.

On April 3, 1974, three days after the inventory was counted, Steinberg felt sick while at work. Abraham Bresnick, the defendant's father-in-law, who also worked for the business, stated that he walked into Steinberg's office and noticed that Steinberg's "face was gray and ashen," and that he would not respond to any questions. An ambulance was summoned and Steinberg was taken to the Elliott Hospital. At the hospital, it was diagnosed that he had suffered a "massive heart attack." He was later transferred to the intensive cardiac unit at Peter Bent Brigham Hospital in Boston where he died on April 11.

At the time of his death, Steinberg was 44 years old, married, and the father of two children. His last medical examination had been on February 13, 1974. The examining physician, Dr. Stewart Richmond, found that the defendant's health was normal, but that he exhibited certain heart attack risk factors. Those included the fact that both his parents suffered heart attacks, his blood pressure was elevated, he had a high cholesterol level in his blood, he smoked cigarettes, and was slightly overweight. Dr. Richmond recommended that Steinberg have further tests, including an electrocardiogram, and chest X-rays. The next time Dr. Richmond saw Steinberg was the day of his admission to the Elliott Hospital.

Mrs. Steinberg and the deceased's dependent children filed for workmen's compensation benefits pursuant to RSA 281:22. After a hearing, the deputy labor commissioner awarded benefits. An appeal of his decision resulted in a trial de novo in the superior court. At the trial, the expert medical testimony conflicted on the essential issue of causation, one side arguing that a causal relationship exists between psychological tension and overexertion and heart attacks, the other arguing that there is no causal relationship. An eminent cardiologist, Dr. Elliot L. Sagall, testified that, even assuming an individual is suffering from psychological stress, pressure, and tension, there is still no scientific documentation which indicates a possible causal connection between such stress and an acute myocardial infarction, such as occurred in this case. An equally eminent specialist in coronary heart disease, Dr. Bernard Lown, who was Steinberg's treating

physician at Peter Bent Brigham Hospital, testified for the plaintiff in a deposition that was submitted to the trial court. Dr. Lown opined that a causal connection was possible between psychological stress and tension and a heart attack. He testified: "Mr. Steinberg was subject to tremendous tension, a lot of restlessness, inadequate sleep, he was going through a complex commotion. It is reasonable to suggest that these factors were contributory to his difficulties."

In a written opinion, the trial court denied any workmen's compensation benefits on the ground that proof of a causal relationship between psychological tension and decedent's heart attack was speculative at best. The primary issues before this court are whether protracted work-related psychological stress and overexertion can cause a heart attack, and, if mental stress can cause a heart attack, the nature of proof that is required to make the heart attack compensable under the workmen's compensation statute.

■ RSA 281:2 V defines a compensable injury under the New Hampshire Workmen's Compensation Act. It reads in pertinent part:

> Personal injury, or injury as used in and covered by this chapter means accidental injury or death arising out of and in the course of employment. . . .

The injured employee must prove two required elements: that the injury or death was accidental; and, that the injury or death was caused by his employment.

■ We have no difficulty in concluding that Steinberg's heart attack and his resulting death met the accidental requirement. In *Jackson v. Emile J. Legere, Inc.*, 110 N.H. 252, 265 A.2d 18 (1970), we held that a claimant need not prove that he was engaged in activities requiring unusual physical stress or strain to satisfy the statutory requirement of accidental injury. The accidental quality of a compensable injury may consist of an unexpected effect as well as an unexpected cause. That is, even though the cause may have been routine and not accidental, a claim is compensable if the effect on the employee is unexpected. *Walter v. Hagianis*, 97 N.H. 314, 317, 87 A.2d 154, 157 (1952); *see* 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 38.82, at 7-167 (1978). Clearly, Steinberg did not expect to die from a sudden heart attack.

Although an injury or death may satisfy the accidental requirement, the injury must still be work-connected to fall within the coverage of RSA ch. 281. *Zwiercan v. International Shoe Co.*, 87 N.H. 196, 197, 176 A.286, 287 (1935). In other words, the employment must be

a cause of the injury. *Pearson v. Wallace*, 93 N.H. 381, 42 A.2d 738 (1945). Causation is essentially a question of proof, and in heart attack cases, there are conflicting doctrines of medical science on proof of causation. The medical dispute involves "(1) whether stress or strain *can* precipitate certain disabling injuries or worsen them, and (2) what criteria must be met to establish *medically* a causal connection when it is agreed that stress and strain can be a factor." *Dwyer v. Ford Motor Co.*, 36 N.J. 487, 513, 178 A.2d 161, 174 (1962) (Weintraub, C.J., concurring) (emphasis in original).

■ This court has accepted the medical view that a causal connection can exist between work-related stress and a heart attack. *Couture v. Mammoth Groceries Inc.*, 116 N.H. 181, 355 A.2d 421 (1976); *Jackson v. Emile J. Legere, Inc.*, 110 N.H. 252, 265 A.2d 18 (1970). In both *Couture* and *Jackson*, the precipitating factor of the heart attack was physical stress, whereas in Steinberg's case the precipitating factor was work-related psychological stress and overexertion. The legal character of the case does not change when the stimulus leading to the heart attack takes the form of sustained anxiety or pressure. There is no valid reason to sustain a claim based on physical exertion and deny one based on mental or emotional stress. And it is generally held that compensability is not foreclosed by the fact that the heart attack is caused by mental as opposed to physical stress. *See, e.g., Hoage v. Royal Indem. Co.*, 67 App. D.C. 142, 90 F.2d 387, *cert. denied*, 302 U.S. 736, 778 (1937); *Ferguson v. HDE, Inc.*, 264 La. 204, 270 So. 2d 867 (1973); *Klimas v. Trans. Caribbean Airways, Inc.*, 10 N.Y.2d 209, 176 N.E.2d 714, 219 N.Y.S.2d 14 (1961). *See generally* 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 42.21, at 7-349 (1978).

In Steinberg's case, the psychological stress continued over a number of weeks. No sudden event stands out as having precipitated the final heart attack. There are contending schools of medical opinion as to whether long-term psychological stress and overexertion can provide the causal nexus of a myocardial infarction. One medical thesis is that there must be psychological stress immediately prior to the onset of any symptom of cardiac arrest. This view is espoused in the testimony of Dr. Elliot Sagall:

> This leaves the question as to whether or not long working hours, alleged tensions, pressures, psychological stress emanating from work activities, played any role in either initiating his underlying coronary disease or hastening its progress, or leading to his myocardial infarction sooner than ordinarily might have occurred, had he not had such

alleged stress. Well, this entire question is one which has not been definitively answered, from the point of view of medical studies. A number of factors have been pointed out as possible contributing elements in leading to myocardial infarction or coronary disease sooner than ordinarily might have been expected or putting an individual at increased susceptibility to this condition. This man's medical background pointed to some of these: hypertension, obesity, cigarette smoking, positive family history of coronary disease in both parents, indicating genetic susceptibility. The question as to whether or not long-term emotional stress, psychological stress and tension play any role in this disease, is still unanswered medically . . . [I]t is my opinion that allegation of cause and effect relationship between this man's death from a myocardial infarction, an expected occurrence during the natural history of coronary disease and so-called work-emanating stresses, is conjectural and just cannot be proven medically.

Dr. Sagall therefore concluded that Steinberg's heart attack was not work-related.

Dr. Bernard Lown testified on behalf of Mrs. Steinberg by way of deposition. It was his opinion that the proximity in time of psychological stress and overexertion need not be direct in terms of minutes, but could occur over a period of weeks or months. He enunciated his reasoning in the following colloquy:

Q. If I understand correctly what you're saying then, Doctor, you're not saying the tension was the direct proximate cause of his myocardial infarction but part of his overall lifestyle which was in your opinion a contributory factor in bringing about a series of degradation of his arterial system, is that what you're saying?

A. I'm saying two things, let me make that clear. The first thing I'm saying is your formulation is a correct one. There was working of degradation toward that contribution by virtue of the stress, there was contemporary pressures which hastened it. And secondly I say what precipitated the myocardial infarction, that precipitation doesn't require any immediate causality of the day before or the moment before. And Jurisprudence better move away

from that point of looking at it as though it was an automobile accident. It's not an automobile accident. You can have things have happening for a long time and then initiate a chain of events that leads to an interception of a catastrophe. That interception is predictable. Like you start a missile in orbit, it goes on. You know it's going to hit another missile if the two are determined by what happens immediately, that is already preset. And in this sense, I think that his pressure and tension were not only the result that contributed to arteriosclerosis but were factors in contributing more proximately the myocardial infarction.

The dilemma confronting this court is well stated by Mr. Chief Justice Weintraub in a concurring opinion in *Dwyer v. Ford Motor Company*, 36 N.J. 487, 513-14, 178 A.2d 161, 174–75 (1962):

[W]e do not have the conventional situation in which the basic medical thesis is undisputed, doctors merely disagreeing as to whether on the facts of a case a causal connection is probable. When there are contending schools of medical opinion as to whether there *can* be a connection between stress or strain and the onset or aggravation of some cardiac injury, a court cannot reach the facts of the particular case unless it first accepts the view that a connection is medically possible, and, of course, to do so necessarily involves a choice between incompatible medical doctrines. (Emphasis in the original.)

The plaintiff, N.H. Supply, argues that a "choice" between the two schools of medical opinion should be made at either the trial level or by the legislature. If we were to leave this decision to the trial court,

the fate of the litigants would then depend upon the identity of the judge who happens to hear the case. It would be idle to say that each litigant has a fresh chance to prevail before a given judge, for the judge could hardly accept antithetical theories in successive cases merely on the basis of the relative persuasiveness or credibility of the particular experts who happen to appear.Thus cases would virtually be decided by the very act of assignment for trial.

*Dwyer v. Ford Motor Co.*, 36 N.J. at 514, 178 A.2d at 175. We agree with this reasoning and prefer not to let this decision be made at the trial court level.

This court has previously noted the need for legislative standards in workmen's compensation cardiovascular cases. *Jackson r. Emile J. Legere, Inc.*, 110 N.H. 252, 255, 265 A.2d 18, 20 (1970) (Kenison, C.J. concurring). *See generally* Comment, *Problems and Suggested Solutions to Cardiovascular Cases in the Workmen's Compensation Field*, 6 WILLAMETTE L.J. 95 (1970). Nevertheless, no legislative standards have been enacted that would lend guidance to the courts.

The claimant has a right to benefits if the deceased's injury met the requirements set forth in the law. It is this court's responsibility to interpret and apply the law as it currently exists. Therefore, we reject the position that work-connected overexertion and sustained psychological stress can *never* provide the medical causal nexus for compensable myocardial infarctions, and a single sudden precipitating event is not a legal requirement. This position is consonant with the basic philosophy of workmen's compensation that employers are required to pay for all injuries causally related to the employment. *Armstrong r. Lake Tarleton Hotel Corp.*, 103 N.H. 450, 453, 174 A.2d 410, 414 (1961). The vast majority of courts are in agreement with this view. *See, e.g., Lamb r. Workmen's Compensation App. Bd.*, 111 Cal. 3d 274, 520 P.2d 978, 113 Cal. Rptr. 162 (1974) (en banc); *Mississippi Research & Development Center r. Dependents of Shults*, 287 So. 2d 273 (Miss. 1973); *Clayton r. State Compensation Dep't*, 253 Or. 397, 454 P.2d 628 (1969) (en banc); *Klimas r. Trans. Caribbean Airways, Inc.*, 10 N.Y.2d 209, 176 N.E.2d 714, 219 N.Y.S.2d 14 (1961). *See generally* 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 42.21, at 7-356 (1978).

Our holding does not automatically entitle the claimants to the requested relief; we only hold that psychological stress and overexertion *can* cause a work-related heart attack. Once the causal relationship is accepted as possible the claimant still must prove that "the work-related stresses in the particular case at issue were a causal factor in the heart attack which ensued." *Clayton r. State Compensation Dep't*, 253 Or. 397, 402, 454 P.2d 628, 630 (1969); *see* Editorial Note, *Standards of Proof in the Heart Attack Cases: The Dwyer Doctrine*, 16 RUTGERS L. REV. 754, 759–60 (1962). In each case, analysis should therefore focus on whether there is sufficient proof of causal work-related stress. The claimants had to show by a preponderance of evidence that the actual work-related stress precipitated decedent's heart attack. In other words, the claimants had to prove both medical and legal causation.

The legal causation test defines the degree of exertion that is necessary to make the injury work-connected. 1B A. LARSON, WORK-

MEN'S COMPENSATION LAW § 38.83, at 7-171 (1978). The test to be used depends upon the previous health of the employee. *Beck v. State*, 184 Neb. 447, 480–81, 168 N.W.2d 532, 533 (1969); *see Couture v. Mammoth Groceries*, 116 N.H. 181, 183, 355 A.2d 421, 423 (1976). Where there is a prior weakness in the form of a previously weakened or diseased heart, then the employment must contribute something substantial to the heart attack. 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 38.83, at 7-172 (1978); *see Dwyer v. Ford Motor Co.*, 36 N.J. 487, 178 A.2d 161 (1962). That is, the employment-connected stress or strain must be greater than is encountered in normal nonemployment life. Thus, heart attacks that actually result from work-related stress are distinguished from those that occur at work merely as a result of natural physiological process. If there is no prior weakness or disease of the heart, *any* exertion connected with the heart attack as a matter of medical fact is adequate to satisfy the legal test of causation so as to make the injury or death compensable. *Couture v. Mammoth Groceries Inc.*, 116 N.H. 181, 183, 355 A.2d 421, 423 (1976); 1B. A. LARSON, WORKMEN'S COMPENSATION LAW § 38.83, at 7-172 (1978).

■ In addition to legal causation, that is, that the stress was work-connected, the claimants must also prove as a fact medical causation. In other words, the claimant must medically prove that the work stress or exertion probably caused or contributed to decedent's heart attack. *Couture v. Mammoth Groceries Inc.*, 116 N.H. at 183, 355 A.2d at 423; 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 38.83, at 7-170; *see Clayton v. State Compensation Dep't*, 253 Or. 397, 454 P.2d 628 (1969); *Aladits v. Simmons Co.*, 47 N.J. 115, 219 A.2d 517 (1966). *See generally* 3 A. LARSON WORKMEN'S COMPENSATION LAW § 80.32 (1978).

The trial court understandably, did not apply the rule of law we enunciate today: that protracted work-related psychological stress can cause a heart attack which can be compensable under our workmen's compensation law. RSA ch. 281. We, therefore, remand the case to the trial court to determine from the record and in accordance with our opinion, whether Steinberg's heart attack was legally and medically caused by his work-related stress.

*Remanded.*

All concurred.